Good morning, your honors. Pamela Larry Tower on behalf of Daniel Kealoha Aukai. Your honors, I think Mr. Brady will support me. There are no disputed facts in this appeal. There is a disagreement as to the application or the scope of the application of the administrative search that was conducted here. We don't dispute that Mr. Aukai asked to leave the airport before any secondary screening began. Is it true that he had no ID? He had no ID. I think this is a, you know, you raise some interesting questions in your brief, but to me, if he noticed or something, was asked to go through secondary, he said, I'm not going to put up with this. I'm going to go home. That might be one case. But it triggered for me in this case, and maybe you can say why it shouldn't be, was the fact that he had no ID at all and therefore referring him to secondary inspection was a triggering event and therefore he should not have been permitted to leave. There was cause for concern because he had no ID. That is not what's in the record, Your Honor. It's actually Please correct me. Standard operating procedure is, you can fly without an identification card. You will be subject to secondary screening if you do so. So that is, that's standard operating procedure for anybody. So it cannot be considered a triggering factor. In other words, if I had gone through without my ID, there would have been the notation on the boarding pass and I would have been subjected to secondary screening. So why then it triggered secondary inspection? For no identification? Yes. I don't know what their regulations are, but it does for everybody, not just for Mr. Al Kai. Oh, I understand that. Yeah. And I think that that, what you're looking at, I believe, Your Honor, is that that then became the first triggering event of suspicion. And under, I think it's Fuentes is the case that I cited. Now, are you told that when you have no ID that you're going to be screened? There's nothing in the record, so I can't say. Okay. What is in the record is that the agent, the TSA officer, testified that it is standard operating procedure to send people to secondary search who don't have identification. And it says on there no ID, right? No ID, that's correct, on the boarding pass. And so you can see that on your boarding pass. That's correct. Now, what was in the record about whether he said he saw that it said no ID? I believe the record reflects that it was the first TSA agent at the, I'm going to call it the magnometer. I know it actually has a different technical name. But at the walk-through magnometer, she said that she remembered seeing the boarding pass with no ID, and then that's what prompted her to send him over to the secondary search area, which is a roped-off area within visual line of this first TSA officer. So Mr. Alki was sent over there. Standard operating procedures had nothing to do with him as a person, with him looking or meeting any kind of profile. He simply did not have his identification card or any other kind of photo ID. So he goes over, she sends him over to secondary screening. But he has told her as he's going through the magnometer, which he does not trigger, and neither do any of his goods in the initial basket. He does not trigger the walk-through magnometer. He says, I'm in a rush, I'm late, worse to that effect. And that is undisputed that he says that on several occasions. Because it was 9 o'clock when he went through and he had a 9.05 flight. That's correct, Your Honor. Right? So he's rushing. But he first went to the roped area. He did. And he didn't stay there. Well, he actually went to the roped area and the undisputed evidence is that he began to collect his things up, I guess, from the little plastic tray to put them back in his pocket to leave. And the first TSA agent at the magnometer said, no, no, no, you have to stay there. So he did. When the second officer arrived, and this is the critical stage, I believe, of this entire inquiry, and his name was, I believe, Mizajan, Mr. Alki told him he wanted to leave. Before any wanding began, before any pat-down, before anything, Mr. Alki told him, I want to leave. And he didn't let him leave. He proceeded with a wanding of the back of Mr. Alki and then the front of Mr. Alki. And it is the wanding after Mr. Alki asked to leave. Oh, well, it's over for him at that point when things start beeping. The alert went off and that was it. But timing is everything, Your Honors. Well, if you go through with no ID and then you go to the area and then you want to leave. Obviously, we don't have any case exactly like this from the standpoint. Because the other cases, it's people have to be, you can screen, but people have to be free to leave. But when you go through with no ID, and ID requires secondary screening, and then you leave, then the question is whether has that created a sort of suspicion? And then if just letting someone leave at that point, are you averting the danger that could be occurring? Because obviously, they tried to get through with no ID. Then they didn't want to do their secondary screening. So the no ID is a little different than any of the other cases. I think that it's not because of the testimony of the TSA operators, which is you can. If you have no ID, you can fly. You just have to be willing to go through the secondary search. But what is the purpose of the secondary search? You have no ID, you can fly. But you first of all, let's go to secondary screening. Your Honor, I'm sorry. I didn't do the suppression hearing, and therefore, the regulations or the questions weren't asked as to that. So I cannot answer what the purpose is. But what I can remind the Court is that it has, it's a very discreet purpose. The regulations are discreet in purpose, which is to prevent the carrying on of materials or substances or weapons or armaments that would endanger an airplane and the people on the airplane. Everything is forward thinking when you have an airport search or an administrative search. And I'm not saying that I fly. I'm not saying that it's not, that these are not reasonable or unreasonable. But I do not accept and I cannot accept the government's position that by my walking through a magnometer, ID or no ID, I have lost the right to revoke my consent. What they're saying is that if I walk through that magnometer, I cannot leave. Now, if you couldn't leave once you walked through the magnometer, that would be a whole different story. But you can. I can walk through the magnometer, take out my computer, have them look at everything, take my shoes off, put them back on, go out and see what time my flight's leaving, learn that it's late, go out and smoke ten cigarettes and come back and do it over again. So I can leave. And I don't have to ask anybody. Mr. Alki asked to leave. He had no intention of boarding the plane. Even if I, my own hypothetical, my own example, I walk in, my flight's late, I leave, period. He had the intention of boarding the plane when he first went through the magnometer. Absolutely. Because I'm late. I'm late. Then he changes his mind and says, I want to leave. Isn't that by itself in this day and age a symbol of suspicion? No, Your Honor. It's not. We're not only concerned with taking explosives onto planes, but we're also concerned with both blowing up airports, are we not? No, we're not. I mean, we are. I'm sorry. I take that back. We are. We are, but the regulations... We won't accept your consent, Your Honor. The regulations in question here, the regulations in question here are specific as to their purpose. They're very, very specific and they have nothing to do, unfortunately, or for maybe the government, with protecting the airport, the interior of the airport and the people in the airport. They are geared towards solely airplanes, getting onto airplanes. And they're quite vast, the regs and actually the statutes, but they're crystal clear. You cannot fly unless you consent to be searched. You are not getting on this plane, whether there's a sign or not. And there's no evidence in our record, again, whether there was signage that said, you know, if you don't consent, you're not getting on the plane. But, counsel, your argument might be very well taken if he had an ID. He went through, they don't like his looks, they say go to secondary, and he says, I want to leave. But to me, what the beep is here, although not the metal detector, is the no ID. And there is a reason for requiring identification. So is it your argument really for the person who has an ID goes through, they want to send him to secondary, says, I'm not going to put up with this, I'm going home. He can go home. But in this case, it's precipitated by the fact that he has no identification. But, Your Honor, the testimony by the agents who have been trained is that it's standard operating procedure. In other words, they put no. Well, it may be. But I asked you what the purpose of it was, and you said nothing in the record about the purpose of it. So I'm sure there's a reason for these rules. I'm sure there's a reason. But the fact is that the no ID indication that's put on the boarding pass was put on the boarding pass back at the ticketing gate when he got his ticket. He works for the airline. Well, he works for the airline. He works for the airline. And he had like an easy pass, something to get to flight free. That's correct. So then he goes, he doesn't have his ID, and they just put no ID. And they don't say, no, you can't fly, because a lack of identification indicates to me, you know, the ticket agent, that there's something wrong with you. It just says, okay, no ID. And then the TSA agents take it from there when you head towards the sterile area. And then they say, no ID, secondary search. They don't say, no ID, you might be a terrorist, secondary search. It just says no ID. There's nothing in this record, Your Honor, that would indicate that having no ID is a triggering factor. And, in fact, the evidence is to the contrary. Anybody with no ID is going to be subject to a secondary search. The question is, is that. Well, counsel, I think if you. We have your argument well in line. You've used your time, but we've had a lot of questions for you. It's an interesting issue. So I'll allow you one minute on rebuttal. Thank you. Good morning. May it please the Court. Assistant United States Attorney Tom Brady, representing the United States. I've heard some of the questioning to counsel already, and I tried to look through the record to see what was on the ticket itself. I know that in reading the record earlier, it was in green ink on the boarding pass itself, no ID. There is nothing in the record to indicate that Mr. Alkai read that. But that's what was on the boarding pass. What the government submits is that by passing through the magnetic meter at the airport, Mr. Alkai had impliedly consent to administrative search of his person, and he could not withdraw until that secondary search was completed. To trigger a Fourth Amendment violation, a person must have a subjective expectation of privacy and one that a society is willing to recognize as reasonable. We would submit that the Davis court told us what is a reasonable search at an airport. It has to be no more extensive or intrusive than necessary in light of the current technology to detect presence of weapons or explosives. It must be confined in good faith for that purpose, and passengers must be able to avoid the search by electing not to fly. And for the next 13 years, the question as to when a person could elect not to fly was not answered, and it was only partially answered with the Paludo decision in 1986. Okay, but in that case, the person had already submitted his luggage for an X-ray scan, right? That's correct. So that's sort of, we have Davis, we've got Paludo, and we've got you in between. Something in between. And Torbay as well. We also have Torbay, and I wanted to point that out too because I think it's important. That's a 2002 decision in which the court basically extended Paludo and said, even when there's nothing affirmatively looking suspicious, once you have placed your luggage on that X-ray screen, you cannot withdraw it, and that the screeners can screen that piece of luggage in a secondary search. And I think that's where the link is in this case. I would submit that a bright line has to be drawn somewhere, and I think in time and in conduct and in space, that bright line is when you go through the magnometer. As a person. In this case, Mr. Arcao demonstrated his intent to fly. Excuse me, counsel, let me just ask you a question. Suppose in this case a passenger with an ID gets to the magnometer or whatever it's called, but the security doesn't like his looks. He just looks weird and says, I'm going to ask you to go to secondary inspection. He says, and there's no luggage or anything. He says, I'm not going to do it. I'm going home. Can he force him into secondary inspection at that point? That's an interesting question, and I think that's where Tobert comes in. Because what we had in Tobert is nothing suspicious as that luggage went through that X-ray machine. I'm saying in this case there's no luggage. I understand, but by analogy. I'm saying that there was nothing suspicious, i.e. there was nothing about his looks in your hypothetical. He looks like a terrorist to me. Okay. But I would think that would be an impermissible reason for, say it was based on ethnicity. And I know this court particularly has addressed that. Can you stop an individual because he's Hispanic? No. That is impermissible. Okay. So that person could go home. I would submit to the court that in light of Tobert where it says there's nothing more suspicious that is needed, once you put the luggage through the X-ray. I'm going to tell you the example of a case with no luggage and asking him could he go home. He has an ID. He goes through. I don't like your looks. Go to secondary. He says I won't do it. I'm going home. Can he? At this time, Your Honor, I think. There's no case on that, right? There's nothing on point on that. Okay. But that's not this case. No. Okay. I just wanted to try to distinguish that. I'm sorry. I know the court has talked about that being the bell that went off, or at least in this argument that there was no ID. That was from my perspective. All right. So essentially for you to prevail, you could prevail on that the no ID and going through is a trigger. Sure. And that would not necessarily follow that ID and going through says you can't turn around. Correct. Thank you. Are there any other questions? There appear to be no other questions. Thank you. Counsel, if you'd like to take a minute. You don't need to. All right. We have both of your arguments well in mind. Thank you both for your arguments. This matter stands submitted. United States v. McCarthy, Okiah Carter, 0410300. Thank you.
judges: D.W. Nelson, Callahan, Bea